# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

CEDRIC E. POWELL-EL[1],

                    Petitioner,          :    Case No. 3:16-cv-109

    - vs -                                District Judge Thomas M. Rose
                                       Magistrate Judge Michael R. Merz

MARK HOOKS, Warden,

                                       :
                Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case under 28 U.S.C. § 2254 is before the Court for decision on the merits. The Amended Petition was filed July 17, 2017 (ECF No. 23). Respondent filed an Amended Return September 8, 2017 (ECF No. 31) and Petitioner has filed a Reply (ECF No. 47). The case is therefore ripe for decision.

Powell seeks relief from his conviction and sentence in 1999 in the Montgomery County Common Pleas Court on counts of rape, kidnapping, corruption of a minor, multiple counts of felonious assault, pandering sexually-oriented material involving a minor, and illegal use of a minor in nudity-oriented material.

His original Petition in this case raised one ground for relief:

> **Ground One:** Ineffective Assistance of Counsel.
>
> **Supporting Facts:** Remanded on the 13th of Dec. 2010, Adeleine Hamilton appointed as counsel, we planned for two days for

---

[1] Petitioner has changed his name since originally filing this action. The caption is amended accordingly.

> hearing on the 16 of December. Trial court appointed another counsel on the 15th of Dec. and remocve [sic] my original counsel Ms. Hamilton in chambers, without an explanation, and forced me to take counsel of his choice, who did nothing for me and let trial court do whatever – I had valid argument of a void sentence in accords [sic] with st. [sic] v. Baker for failure to set forth the manner of conviction and a non final appealable order, but my new counsel did nothing. Ms. Hamilton was willing to argue it.

(Petition, ECF No. 4, PageID 17.)

Upon the filing of the Petition, the Magistrate Judge determined that this was a second or successive habeas application because Mr. Powell had filed a previous habeas application attacking the same conviction in Case No. 3:02-cv-214 (Transfer Order, ECF No. 2, PageID 10). Having made that determination, the Court was bound to transfer the case to the Sixth Circuit for Mr. Powell to obtain its permission to proceed under 28 U.S.C. § 2244(b). *In re: Kenneth W. Smith*, 690, F.3d 809 (6th Cir. 2012). *Id.*

The Sixth Circuit disagreed with this Court's second-or-successive decision and remanded the case. *In re: Cedric E. Powell*, Case No. 16-3356 (6th Cir. Jan. 6, 2017)(unreported; copy at ECF No. 6). It held:

> Powell's application to file a second or successive habeas petition is unnecessary. As the respondent concedes, Powell does not need authorization to file a successive habeas petition to the extent that his claims arise out of his 2011 resentencing hearing. *Magwood v. Patterson*, 561 U.S. 320, 342 (2010). Moreover, pursuant to our decision in *In re Stansell*, 828 F.3d 412, 413-14 (6th Cir. 2016), Powell's resentencing hearing created a new judgment, freeing him from the requirement to seek authorization to file a second or successive habeas petition to challenge any other aspect of his convictions and sentence. Although the respondent contends that *Stansell* was decided incorrectly, we are not at liberty to disregard it. *See United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997).

*Id.* at PageID 22.

2

Powell was then granted leave to amend to re-plead his original habeas claims and has done so (Amended Petition, ECF No. 23). His Amended Grounds for Relief from the 2002 Application read:

> **2002 Ground One**: Petitioner was denied a fair trial when trial court committed prejudicial error in the consolidated trial by allowing the state to circumvent the prohibition of other acts and photos in a charged offense of rape, Ct. 1-4 should have been severed from Ct. 5-18.
>
> **Supporting Facts:** The petitioner did rely upon a state case employing federal constitutional analysis joinder allowed the circumvention of other acts evidence which was prejudicial citing *State v. Schaim* 65 Oh.St.3d 51 citing *Drew v. U.S.* 331 F.2d 85, 93. The petitioner did give the trial court adequate motions arguing severance and its prejudicial effect. The evidence from cts. 1-4 were (sic) different those alleged offenses alleged were done in 1999, and cts. 5-18 were alleged to have happened in 1998. Cts. 1-4 were of an alleged forceful nature, and other cts. 5-18 were merely photos deemed inappropriate. Cts. 5-18 tainted cts. 1-4 and caused the jury to convict. The photos did not depict any evidence of cts. 1-4, but merely inflamed the jury. *State v Schaim* 65 Oh.St.3d 51 cites *Drew v. U.S.* 331 F.2d 85, 93 a state case which relied on federal analysis as in *Picard v. Conner* 404 U.S. 270, 276.
>
> **2002 Ground Two**: Amended; The Petitioner was denied a fair trial when illegally seized and searched evidence was allowed in trial and presented to the jury to obtain a conviction on all counts.
>
> **Supporting Facts:** Illegally seized evidence was not harmless, error where the whole of the state's case was based on these illegally seized videos that had nothing to do with an alleged rape, or kidnapping. The testimony was one continuous dialogue of other acts directed toward the Petitioner's character, as opposed to an actual crime. Considering that there were other females on the video and home video of Apt. one witness, giving their version of events; despite a picture being worth a thousand words, once, the bell is rung it can't be un-rung. This evidence was used in conjunction with perjury by the alleged victim and supported and/or encouraged by the state. The state participated directly with fabricating evidence in order to obtain this conviction.
>
> **2002 Ground Three:** The petitioner was denied due process of law where the appellate court reverse some convictions based on

illegally seized evidence but allows other convictions to remain based on exactly the same illegally seized evidence.

**Supporting Facts:** The trial court allowed evidence of the video tape to be presented in a trial for alleged rape, kidnapping, and assault which had nothing to do with any of the aforementioned offenses. The defense filed several motions opposing the introduction of this evidence and why it would be prejudicial citing state case using federal analysis, State v Schaim, 65 Oh. St 3d 51. The video evidence was intricately [sic] tied to Ground two (amended) because illegally seized evidence was vacated by the 2nd Dist. Court of Appeals, creating retroactive misjoinder which arises when prejudice results from proper joinder that is later rendered improper by Appellate Court reversal of fewer that an all convictions; which is what was done in this case.

**2002 Ground Four:** The Petitioner was denied the effective assistance of counsel.

**Supporting Facts:** The Petitioner was denied the effective assistance of counsel after his retained counsel was made a witness for the state and the trial court appointed Charles Smiley, as counsel of his choice to represent Petitioner. Smiley told a witness with exculpatory testimony not to come to trial. Counsel's actions prejudiced petitioner and the reliability of the outcome of the trial was suspect. *(note this is the first of two times the trial court has removed counsel and appointed his own)

Counsel did not provide petitioner with reasonable representation or constitutional protection guaranteed by the 6th Amend. His action fell below a reasonable objective standard of representation and violated his duties to the Petitioner. Inadequate legal assistance guaranteed by the Sixth Amendment, constitutes an unconstitutional deprivation of the petitioner's liberty. The ineffective assistance of counsel claim presented substantive grounds for relief.

(ECF No. 23, PageID 743-49.)

**Procedural History**

Petitioner Cedric Powell-El was convicted by a jury in the Montgomery County Court of

Common Pleas on counts of rape, kidnapping, corruption of a minor, multiple counts of felonious assault, pandering sexually-oriented material involving a minor, and illegal use of a minor in nudity-oriented material and sentenced to twenty-two years' imprisonment. On direct appeal to the Ohio Second District Court of Appeals, convictions on three counts were vacated, reducing the aggregate sentence to twenty-one years. *State v. Powell,* 200 WL 1838716 (2nd Dist. Dec. 15, 2000), appellate jurisdiction declined, 91 Ohio St. 3d 1508 (2001).

The Second District found the following facts underlying the convictions:

> The facts underlying this appeal are set out in the State's brief and are supported by our examination of the record. In February of 1998, fifteen-year-old Shannon Trammell went to Time Communications ("the store"), a pager and cellular telephone store located at 1450 W. Third Street in Dayton, to return a pager. At that time Shannon met appellant, the owner of the store. Thereafter, Shannon spent almost everyday at the store, playing on the computer and watching television. Between September 1 and November 30, 1998, Powell took photographs and made a video of Shannon engaging in sexual activity with him and in various stages of nudity. While taking the photos and making the video, Powell told Shannon what to do and how to pose.

> On Thursday, February 18, 1999, Shannon received a telephone call from appellant at her home. Powell asked her to watch the store for him while he ran errands. Shannon agreed and Powell picked her up at her house sometime before dinner. As Shannon and Powell drove to the store, Powell questioned Shannon about some money. When Shannon explained to Powell that she did not know anything about any money, Powell slapped her across the face with his hand. Shannon got out of the car and tried to walk away from Powell, but Powell grabbed her by her coat, took hold of her arm, and guided her inside and into the back room of the store.

> Once in the bedroom area, Shannon testified that Powell began to hit her with his hands and rip at her clothes. When Shannon tried to fight back, Powell began to kick her, all the while asking about his money and a ring. When Shannon repeated that she did not know what he was talking about, appellant whipped her naked body with an extension cord and beat her with a spindle from a stair banister.

To ensure that Shannon did not escape, Powell handcuffed Shannon's left arm to the bed and tied her right arm to the bed with the extension cord. Powell placed a blue blanket over Shannon's head and stated, "bitch, I'm about to kill you." Shannon was able to pull the blanket down from her eyes with her arms and observed Powell pull out a gun. Powell put the barrel of the gun in Shannon's mouth, then took the gun out of her mouth, pointed it at her, and fired. Shannon testified she felt the bullet fly by her head and then felt the hard metal surface of the gun make contact with her head just behind her left ear.

As Shannon attempted to recover from the blow to her head, Powell poured gasoline over her. The gasoline drenched the coat that was still hanging from Shannon's arm and ran into her mouth and eyes. Shannon spent Thursday night with her left wrist handcuffed to the bed. Shannon next saw Powell on Friday, February 19, 1999. Powell entered the bedroom, flipped Shannon over on her stomach, bent her upper body over the bed, and penetrated her anally with his penis. Shannon begged Powell to stop, but he continued to rape her for five to ten minutes more.

Meanwhile, Gloria Trammell began to look for her daughter, Shannon, when she had not returned home in over a day. At approximately 11:30 a.m. on Saturday, February 20, 1999, Mrs. Trammell and Quincy Trammell, Shannon's cousin, went to appellant's store. Mrs. Trammell informed Powell that she was looking for Shannon, but Powell stated that he had not seen her.

At the same time, Shannon heard her mother's voice. Shannon called out her mother's name, "Gloria." Quincy heard someone cry out from the back of the store and recognized the voice as Shannon's. Mrs. Trammell noticed that Powell became nervous and fidgety and spoke louder to drown out Shannon's cries. Based on Powell's suspicious behavior, Mrs. Trammell told Powell that she was calling the police, and she and Quincy left the store. Powell went into the bedroom and told Shannon that if she did not "shut up," he would kill her. Powell then ordered Shannon into the closet, warned her to be quiet and closed the door.

Powell, Shannon, and another woman, later identified as Jquan McDade, exited the store through the back door. Thereafter, Shannon was permitted to call her grandmother from a payphone on the corner of Westwood and Hoover, under Ms. McDade's close observation. At the same time, Mrs. Trammell and Quincy were driving down Hoover Avenue and saw Shannon standing at the payphone with Ms. McDade. Quincy immediately jumped out of

the car and ran over to Shannon. Quincy grabbed Shannon's right arm and pushed Ms. McDade out of the way, who was holding onto Shannon's left arm. Ms. McDade threw up her hands and said, "well, it's her life." Mrs. Trammell subsequently took Shannon to Good Samaritan Hospital.

Dr. Rebecca Perry of Good Samaritan Hospital testified that, on Saturday, February 20, 1999, Shannon had generous amounts of bruising to her face, bruising caused by blunt trauma behind Shannon's left ear, abrasions to the back portion of her neck, linear bruising to her inner thighs, abrasions to her left wrist, and loop-like linear bruising to her back which were consistent with being whipped with an electrical cord. Nurse Kathryn Black testified that Shannon's clothes smelled strongly of gasoline.

Detective David Wolford of the Dayton Police Department testified at trial that he was dispatched on December 17, 1998 to the Rite-Aid Pharmacy on Third and James H. McGee in Dayton on a report that the pharmacy had developed photos of naked juvenile females with an adult male. Wolford said he went to the pharmacy and viewed the photographs which were identified in the trial record as State's Exhibits 2-11. The film was left by a person who identified himself as Earl Martin. Wolford said he turned the photos over to Detective Claudette Ison and later participated in the search of Powell's business. It was then that Wolford learned of the identity of the persons in the photographs, Powell and Shannon Trammell.

Earl Martin testified he was a friend of Cedric Powell and often helped him out at Powell's business. Martin said he saw Powell photographing Shannon Trammell. He said Powell used a timer so that he could be photographed with Shannon. Martin said he was also present with Shannon. Martin said he was also present when the videotape was made.

Martin said he was at the store when Shannon came to the defendant's business on Thursday evening, February 18, 1999. At that time Martin said Shannon looked normal. Martin said when he returned the next morning Shannon was handcuffed to a bed. Martin said Shannon's face was "messed up," that her eye was black and swollen shut, and her mouth was busted. Martin said Shannon was wearing torn pants and no shirt. Martin said he then mopped up gasoline which was on the floor of the room where Shannon was located. Martin said Powell told him the next day that he had anal sex with Shannon.

7

Dayton police officers arrested Powell later that evening. Powell admitted to Dayton Detective William Lawson that he had known Shannon Trammell for about two years and that he had sexual intercourse with her on numerous occasions. He denied having sexual relations in the month preceding his arrest. He admitted knowing that Shannon was a teenager.

Powell stated he suspected Shannon of stealing a diamond ring from him in December 1998 but he couldn't prove it. Powell stated to the police that on February 15, 1999 while Shannon was at the store someone stole $ 175 from his coat. Powell said Shannon did not come to the store for a few days. Powell said he then called Shannon and asked to talk to her. Powell said he went to Shannon's home and took her to the store and confronted her about the thefts. Powell said he became angry when Shannon denied responsibility and he "smacked her in the face with his hand."

Lawson testified that Powell told him that Shannon admitted stealing the ring and the money. Shannon told him she gave the ring to her boyfriend, Victor, and used the money herself to buy crack. Lawson said Powell told him he told Shannon she wasn't leaving the store until he got his jewelry back. Powell said Shannon stayed at the store until Saturday February 20, 1999.

Powell denied raping or kidnaping Shannon and stated that Shannon already had injuries when he picked her up at her home. Powell said he thought Shannon's boyfriend Victor had injured her.

*State v. Powell*, 2000 Ohio App. LEXIS 5829 (2nd Dist. Dec. 15, 2000).

Various other state court proceedings were unsuccessful. On November 4, 2010, Petitioner moved for re-sentencing to vacate his sentence which he claimed was void because he had not been notified by the trial court that he was subject to a mandatory term of five years' post-release control on his first degree felonies.

Petitioner appeared for the resentencing hearing on December 16, 2010, but it was re-set to allow preparation of an updated presentence investigation report. On January 6, 2011, he was informed at an in-court hearing that he was subject to "a full five years of post-release control on rape, kidnapping, corruption of a minor, pandering sexually oriented material involving a minor,

and illegal use of a minor in nudity-oriented material and "a full three years" of post-release control for the felonious assault charges." These terms were embodied in an amended termination entry filed January 10, 2011.

Powell-El appealed raising five assignments of error. The Second District eventually granted relief on two assignments that are not material here, but found Powell-El was not entitled to a full re-sentencing and his attorney did not provide ineffective assistance of trial counsel. *State v. Powell,* Case No. CA 24433 (2nd Dist. Jan. 7, 2014)(unreported; copy at State Court Record, ECF No. 12, PageID 331 et seq.) Later, the court affirmed imposition of post-release control except for the rape conviction on which the sentence had already been served. *State v. Powell*, Case No. CA 24433 (2nd Dist. Sept. 5, 2014)(unreported; copy at State Court Record, ECF No. 12, PageID 376, et seq.) Powell-El's motion for leave to file a delayed appeal in the Ohio Supreme Court was denied. *Id.* at Exhibit 38.

In May 2015 Powell-El again filed a motion to vacate and correct a void sentence. *Id.* at Exhibit 44. The trial court denied relief and the Second District affirmed. *State v. Powell*, Case No. CA 26935 (2nd Dist. Sept. 16, 2016)(unreported; copy at State Court Record, ECF No. 12, PageID 537, et seq.) Powell-El filed a third pro se motion to vacate January 31, 2017, which the trial court denied.

In May 2002, Powell-El filed his first petition for writ of habeas corpus in this Court in Case No. 3:02-cv-214. The undersigned recommended dismissal with prejudice (ECF No. 23 in that case). Powell-El did not object and District Judge Rose dismissed the case. Id at ECF No. 24. Powell-El did not appeal.

# Analysis

**Ground One:  Ineffective Assistance of Counsel on Resentencing**

In his First 2016 Ground for Relief, Mr. Powell asserts he received ineffective assistance of trial counsel in his resentencing on December 16, 2010, because the trial court replaced his original appointed attorney with another attorney who was not willing to make the arguments Powell wanted made.

Respondent asserts that this claim is procedurally defaulted because, although it was raised on direct appeal from resentencing, Powell did not timely appeal further to the Ohio Supreme Court (Return of Writ, ECF No. 13, PageID 682).  The record reflects that the Second District Court of Appeals rejected Powell's assignment of error on September 5, 2014 (State Court Record, ECF No. 12, Ex. 35).  Powell did not seek leave to file a delayed appeal in the Ohio Supreme Court until February 2, 2015.  *Id.* at Ex. 37.  This was well past the forty-five day time limit for filing an appeal to the Ohio Supreme Court.

Failure to present an issue to the state supreme court on discretionary review constitutes procedural default.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)(citations omitted).  The Ohio Supreme Court's forty-five day time limit is an adequate and independent state procedural ground for decision.  *Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004).  The Ohio Supreme Court enforced that time-limit against Powell-El when it denied his motion for delayed appeal (State Court Record, ECF No. 12, Ex. 38).

In his Traverse, Powell-El seeks to excuse this procedural default by blaming his appellate attorney for not providing him with a copy of the appellate opinion until November 4,

2014 (ECF No. 47, PageID 841). The Magistrate Judge assumes the truth of that asserted fact. But Powell-El did not file his motion for delayed appeal in the Ohio Supreme Court until February 2, 2015, ninety days after he received the appellate opinion. The deadline for appealing to the Ohio Supreme Court from an intermediate appellate decision is forty-five days from the date of judgment. Assuming all the time between the judgment and Powell-El's receipt of the judgment were excused by attorney error, there are no facts to excuse taking twice the allowed amount of time to file in the Ohio Supreme Court.

The forty-five day time limit on appeal to Ohio Supreme Court prescribed by S. Ct. Prac. R. 7.01(A)(1) is an adequate and independent state ground of decision. *Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004)(citations omitted). Lack of counsel at that stage, lack of a trial transcript, unfamiliarity with the English language, and short time for legal research in prison do not establish cause to excuse this default. *Bonilla*, *citing Murray v. Carrier,* 477 U.S. 478, 494-95 (1986).

Powell-El has not offered sufficient excusing cause for his delay in filing in the Ohio Supreme Court. Therefore his First Ground for Relief is procedurally defaulted and should be dismissed on that basis.

**2002 Amended Grounds for Relief**

The Warden notes that Powell-El's Amended Grounds for Relief are the same grounds he raised in his 2002 habeas petition. The 2002 case was referred to the undersigned who recommended that the first three grounds be dismissed as procedurally defaulted and the fourth

ground be dismissed on the merits (Report and Recommendations, reproduced at State Court Record, ECF No. 12, Ex. 19). Powell-El made no objections and Judge Rose adopted the Report, dismissing the 2002 Petition with prejudice. *Id.* at Ex. 20. Pertitioner took no appeal.

Because these four grounds for relief were litigated on the merits in 2002, the Warden asserts their re-litigation is barred by res judicata or collateral estoppel (Supplemental Return, ECF No. 31, PageID 796, citing *Manis v. Warden*, Case No. 1:14-cv-057, 2015 U.S. Dist. LEXIS 63323 (S.D. Ohio May 15, 2015). In *Manis,* however, the Court was concerned with the collateral estoppel effect of a prior holding of mental incompetency by the Social Security Administration in a later criminal proceeding in an Ohio Common Pleas Court.

Here, however, collateral estoppel or res judicata is urged to run from a prior decision of this Court in habeas corpus. But habeas "long has been understood as an exception to both the rule and the rationale of res judicata . . . ." Hertz & Liebman, Federal Habeas Corpus § 28.2(a)(7th ed.).

While neither res judicata nor collateral estoppel completely bars reconsideration of the Court's prior decision of these four grounds for relief, the parallel doctrine of law of the case strongly suggests that the Court should not. Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation. *United States v. Moored*, 38 F 3d 1419, 1421 (6th Cir. 1994), *citing United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993). "As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *citing* 1B Moore's Federal Practice ¶0.404 (1982); *Patterson v. Haskins*, 470 F.3d 645, 660-61 (6th Cir. 2006); *United States v. City of Detroit*, 401 F.3d 448, 452 (6th Cir. 2005). "If it

is important for courts to treat like matters alike in different cases, it is indispensable that they 'treat the same litigants in the same case the same way throughout the same dispute.'" *United States v. Charles*, 843 F.3d 1142 at *6 (6th Cir. 2016)(Sutton, J.), quoting Bryan A. Garner, et al., The Law of Judicial Precedent 441 (2016).

"Law of the case directs a court's discretion, it does not limit the tribunal's power." *Id.*, *citing Southern R. Co. v. Clift*, 260 U.S. 316, 319 (1922); *Messenger v. Anderson*, 225 U.S. 436 (1912); *see also Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 589-90 (6th Cir. 1995). "While the 'law of the case' doctrine is not an inexorable command, a decision of a legal issue establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *White v. Murtha*, 377 F.2d 428 (5th Cir. 1967), quoted approvingly in *Association of Frigidaire Model Makers v. General Motors Corp.*, 51 F.3d 271 (6th Cir. 1995).

**2002 Ground One**

In his first Ground for Relief in the 2002 Petition, re-pled here, Powell-El asserts he was constitutionally entitled to have Counts 1-4 of his Indictment severed for trial from Counts 15-18. In opposing relief on this ground in 2002, the Warden asserted it was not fairly presented to the Ohio courts as a federal constitutional claim and this Court accepted that argument (Report and Recommendations, Case No. 3:02-cv-214, ECF No. 23, PageID 27). Powell-El made no

objection and took no appeal. However he now says that he made a fair presentation of the claim as a federal claim when his counsel cited "*State v. Torres*, 66 Ohio St. 3d 340[2] (1981)." The Second District Court of Appeals decided the joinder issue as follows:

 [*18]  In his **second** assignment, Powell contends the trial court erred in failing to sever counts one through four from the remaining counts in the indictment, Counts 5-18. The first four counts allege the defendant committed the crime of rape, kidnaping, and two counts of felonious assault. These counts portray events occurring between February 18-20, 1999. The remaining counts relate to graphic sexually-oriented materials that were produced with Shannon Trammell's cooperation between September 1, 1998 and November 30, 1998.

Powell contends the trial court should have granted his severance motion because the State's evidence that the defendant photographed and filmed Shannon Trammell engaging in lewd and obscene behavior could forseeably inflame the jury and impair their ability to render an impartial verdict on the first four counts in the indictment.

Powell argues that the videotape was created under far different circumstances and with a different motivation than was allegedly present in the counts alleging assaultive conduct. Powell notes that Shannon Trammell admitted that she engaged making the video and helped create it.

The State argues that joinder of all the counts in the indictment was proper as the counts all involved the same victim and the latter counts formed the background and provided the jury with a motive for counts one through four; i.e. his desire to dominate and manipulate Shannon Trammell. The State also argues that the defendant cannot demonstrate how he was prejudiced since the evidence as to each group of charges was simple and direct.

Pursuant to Crim.R. 8(A), joinder of multiple offenses is permitted when the charged offenses are "of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." As a general rule, joinder of offenses is favored to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to

---

[2] *Torres* is actually reported at 66 Ohio St. **2d** 340.

conserve judicial resources, and to diminish inconvenience to the witnesses. *State v. Torres* (1981), 66 Ohio St. 2d 340, 343, 20 Ohio Op. 3d 313, 421 N.E.2d 1288.

If offenses are properly joined, as in the instant case, a defendant may move to sever under Crim.R. 14. A defendant claiming error in the joinder of multiple counts in a single trial must make an affirmative showing that his rights were prejudiced. *Torres, supra at 343*. A defendant cannot demonstrate prejudice where evidence of each of the offenses joined at trial is simple and direct. *State v. Franklin* (1991), 62 Ohio St. 3d 118, 122, 580 N.E.2d 1. **HN14**☂ Where the evidence is uncomplicated, the jury is believed capable of segregating the proof on multiple charges. *Torres, supra.*

We agree with the State that the evidence related to all counts was simple and direct. The jury was not likely to become confused about the separate allegations in the indictment. The jury might believe that defendant engaged in consensual sexual conduct with the juvenile but not non-consensual conduct such as rape, kidnaping, and assault. For an appellate court to reverse a trial court ruling that denies severance, the accused must show that the trial court abused its discretion. *State v. Franklin, supra,* at 122. We find no abuse of discretion on the state of this record. The second assignment of error is overruled.

*State v. Powell,* 2000 Ohio App. LEXIS 5829 (2nd Dist. Dec. 15, 2000). Thus the Second District did not evince any understanding that it was confronted with a constitutional issue. *Torres* itself did not purport to decide any federal constitutional issues. The federal authorities cited by the *Torres* court[3] all involved non-constitutional issues.

Powell-El has not shown his first ground for relief was fairly presented to the Ohio courts as a federal constitutional issue. There is, therefore, no reason to vary from the law of the case determining that this ground is barred by procedural default.

---

[3] *Opper v. United States*, 348 U.S. 84 (1954); *United States v. Ragghianti*, 527 F.2d 586 (9th Cir. 1975); *United States v. Catena*, 500 F.2d 1319 (3d Cir. 1974); *Wangrow v. United States*, 399 F.2d 106 (8th Cir. 1968); and Wright, Federal Practice and Procedure 468.

**2002 Grounds Two and Three**

In his second and third Grounds for Relief re-pleaded from 2002, Powell-El claims he was convicted on illegally seized evidence. In 2004 the Magistrate Judge found these Grounds for Relief procedurally defaulted on the same basis as Ground One, to wit, failure to fairly present it as a federal constitutional claim to the Ohio courts (Report, Case No. 3:02,cv-214, ECF No. 23, PageID 27.

Powell-El first argues that these "claims were presented as facts well within the mainstream of a constitutional violation, despite the framing of the words, because any Fourth Amendment violation is of a constitutional magnitude that violates one's rights guaranteed under the United States Constitution." (Traverse, ECF No. 47, PageID 854). He also asks the Court to "forego procedural default issues, and address the merits of Powell's claims. *Id.*

The Magistrate Judge now concludes the analysis of these Grounds for Relief in the 2004 Report is too cursory. Powell-El did indeed pursue a Fourth Amendment claim on appeal, but it was limited in scope. The Second District found that seizure of the camcorder with a videotape showing the victim was beyond the scope of the search warrant Dayton Police possessed. It therefore suppressed that evidence and dismissed the counts of conviction which depended on it, to wit, Counts 6, 12, and 15. *State v. Powell, supra.*

While these two Grounds for Relief are pleaded as Fourth Amendment violations, it is clear from his Traverse that Powell-El's real claim is that he was convicted in part on the basis of the illegally-seized videotape and thus this "other bad acts" evidence (evidence of consensual sexual activity with Shannon Trammell in 1998) was used to bolster the evidence on the much

more serious 1999 charges of raping and beating the same victim. Powell-El calls this error "retroactive misjoinder." The Magistrate Judge's 2004 Report correctly concluded that this claim – use of other bad acts evidence – had not been presented to the state courts as a federal constitutional claim and was thus procedurally defaulted.

Powell-El cites authority allowing a habeas court to bypass a procedural default and decide a case on the merits (Traverse, ECF No. 47, PageID 854, citing *Lambrix v. Singletary,* 520 U.S. 518 (1997); *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003); and *Jackson v. Anderson*, 141 F. Supp. 2d 811 (N.D. Ohio 2001). That rule only applies if the court decides the merits **against** the petitioner.

Powell-El did not present an "other acts" constitutional claim to the Ohio courts and thus his 2002 Grounds Two and Three were correctly found to have been procedurally defaulted in 2004. Nothing he has said in the Traverse persuades the Magistrate Judge to depart from the law of the case on those claims. Moreover, even if he had presented this as a constitutional claim, it would be without merit. The Supreme Court has never held that presentation of other acts evidence violates the Constitution. "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003), noting that the Supreme Court refused to reach the issue in *Estelle v. McGuire*. 502 U.S. 62 (1991).

**2002 Ground Four**

In his fourth 2002 Ground for Relief, Powell-El claims he received ineffective assistance

of trial counsel Charles Smiley when he told a witness with exculpatory evidence not to come to the trial. His statement of the supporting facts for this claim was somewhat different in the 2002 Petition than it is in the current Petition:

> **Supporting Facts:** The Petitioner was denied the effective assistance of counsel after his retained counsel was made a witness for the state and appointed counsel for trial advised witness[es] with exculpatory evidence/testimony [not] to come to trial after being subpoenaed to testify for defense. The testimony would have been based on three notarized letters of recantation adduced at trial, refuting the guilt of Petitioner as the perpetrator of the rape, kidnaping, and assault. The alleged victim authenticated the three (3) letters of recantation at trial, but agreed with the state that she could write but not read. The alleged victim told several people – Davonte Kelley, Katina Benson, and an attorney William Rohrkaste – that the Petitioner did not commit the offenses indicated in the first four counts of the indictment. The trial court ruled that if the alleged victim denied these facts then these witness[es] could come in to testify. Trial counsel then represented to the court that he would ensure their presence. At the close of defense case-in-chief trial counsel refused to compel witness[es] Davonte Kelley et al. because he feared what they might say once compelled.

(Petition in Case No. 3:02-cv-214, ECF No. 1). In the 2004 Report, the Magistrate Judge rejected Respondent's procedural default defense, but found the claim was without merit because the Second District had decided this claim adversely to Petitioner's position and its decision was not an objectively unreasonable application of the federal standard for ineffective assistance of trial counsel adopted in *Strickland v. Washington,* 466 U.S. 668(1984)(Report in 3:02-cv-214, ECF No. 23, PageID 27-30). In the prior Report, the Magistrate Judge wrote:

> In deciding that Petitioner had not received ineffective assistance of counsel in the way he alleges in Ground Four, the Montgomery County Court of Appeals adopted the extensive findings made by the trial judge, The Honorable Dennis Langer of the Montgomery County Common Pleas Court. Judge Langer found the Affidavit of Devonte Kelley not credible because it directly contradicted the representations trial counsel Charles Smiley had made to the court about Mr. Kelley's non-appearance at trial. Moreover, Judge

> Langer found that even if Mr. Kelley were to be believed and he was discouraged from testifying by Mr. Smiley, there was no reasonable probability his testimony would have affected the outcome of the trial because of the overwhelming evidence of guilt, both direct and circumstantial. *State v. Powell*, 2003 Ohio App. LEXIS 3943 (Ohio App. 2d Dist. August 22, 2003).

*Id.* at PageID 29.

Powell-El contends the Court should not apply the law of the case to this ground for relief because the claim was not thoroughly litigated in 2004 because of failure to file of his retained attorney (Traverse, ECF No. 47, PageID 861). Rather than apply the law of the case as stated in the prior Report, the Magistrate Judge has reviewed the cited decision of the Second District on appeal from denial of post-conviction relief, *State v. Powell*, 2003 Ohio App. LEXIS 3943 (2nd Dist. Aug. 22, 2003). That opinion recites at length the relevant findings of Judge Langer as follows:

> **[*P8]** "In his *Petition for Post-Conviction Relief,* Powell has submitted the affidavit of Devonte Kelley in which Kelley claims that he told Powell's attorney, Charles Smiley, of Shannon's recantation, but that 'he [Smiley] said, I should testify in court, but I don't have to come, what I say want [sic] matter because the videotape and photos are going to hang [**3] him, so don't worry about coming to court to testify. So for that very reason I did not come to court to testify.' Petition, Exh. 3, Affidavit of Devonte Kelley. This affidavit was signed by Kelley on December 16, 2001 and was mailed to Powell at the Chillicothe Correctional Facility.

> **[*P9]** "Powell claims that Smiley discouraged Kelley from testifying at trial; that Smiley misled Powell into believing that Kelley's failure to testify was the result of Kelley's own actions; and that Kelley's testimony would have impeached the complainant, Shannon Trammell. This, Powell asserts, constitutes ineffective assistance of counsel that requires the voiding of his convictions.

> ANALYSIS AND CONCLUSIONS
> **[*P10]** "THERE ARE NO SUBSTANTIVE GROUNDS FOR RELIEF THAT WOULD WARRANT A HEARING.

ASSUMING THAT DEVONTE KELLEY HAD TESTIFIED AT TRIAL, IT IS NOT REASONABLY PROBABLE THAT POWELL WOULD HAVE BEEN ACQUITTED.

**[*P11]** "Powell has submitted the affidavit of Devonte Kelley in which Kelley claims that he was discouraged by Powell's attorney, Charles Smiley, from testifying at trial. This claim is completely inconsistent with Mr. Smiley's representations - as an officer of the Court - that he had personally given Kelley residential service; that he had contacted Kelley the previous evening and instructed him to be at court at 9:00 a.m.; and that 'I [Smiley] fully expected that he [Kelley] would be here at 9:00 this morning.'

**[*P12]** "Putting aside whether the question of whether Kelley in fact was discouraged from testifying, this Court finds that if Kelley had testified, it is not reasonably probable that Powell would have been acquitted. This Court reaches this conclusion based upon several grounds:

**[*P13]** "First, Kelley's testimony is not substantive evidence of Powell's innocence. It merely would have been an attempt to impeach Shannon's testimony. The success of that impeachment would be questionable given the testimony of Earl Martin that Powell directed his friend 'Dee-Dee' to ask Shannon if he could pay her not to come to court to testify. Most importantly, Kelley's testimony would have been overwhelmingly outweighed by the testimony of other witnesses who strongly corroborated Shannon's claims of kidnaping, rape, and felonious assault against Powell.

**[*P14]** "Second, Powell's suspicious behavior both during and after the incident is indicative of his guilt.

**[*P15]** "Third, Shannon's behavior and excited utterances immediately after the incident support her claims against Powell.

**[*P16]** "A. Kelley's testimony would have been overwhelmingly outweighed by testimony and evidence that corroborated Shannon's claims of kidnaping, rape, and felonious assault against Powell.

**[*P17]** "1. The corroboration of Shannon's claim that she was brutally assaulted and whipped with an extension cord by Powell.

**[*P18]** "Shannon testified that Powell brutally assaulted her and whipped her with an extension cord. This testimony was corroborated by the following:

**[*P19]** "Powell admitted to Det. Lawson that Shannon stayed at his store from Thursday evening, February 18, until Saturday, February 20. There is no question that Shannon was assaulted during this period of time.

**[*P20]** "Quincy Trammell testified that when he and Gloria Trammel, Shannon's mother, were at Powell's store on Saturday, February 20, he heard Shannon's voice crying out from the back of the store.

**[*P21]** "Gloria testified that when she last saw Shannon on Thursday evening, she had no injuries. When she found Shannon the following Saturday afternoon, Shannon had a cigarette burn on her face, 'whips on her back,' and a black eye.

**[*P22]** "Earl Martin, Powell's friend for 5 to 6 years, testified that on Thursday night, Powell left his store and returned with Shannon. At that point Martin observed no bruises on Shannon's face. Martin heard Powell 'hollering' at Shannon in the back room. Powell ordered Martin to lock up the shop and leave. When Martin returned the next morning, Friday, he observed Shannon handcuffed to the bed. Martin testified, 'She was trying to ask me if I would help her.' Martin testified Shannon's face was 'messed up.' 'Her eye was black. I think it was swollen shut. Her mouth was busted.' He also testified that Shannon was naked from the waist up and that her pants were torn.

**[*P23]** "Dr. Perry examined Shannon on Saturday. She observed bruising to Shannon's entire body, including loop-like linear bruising to her back, which were photographed by Officer Bryant. Dr. Perry testified that these bruises were consistent with being whipped with an electrical cord. Officer Bryant photographed an electrical cord tied to the corner of the bed frame in Powell's store. Bryant testified that the cord was 'tied up in knots.' Shannon identified the photo of the extension cord as the one Powell used to beat her and tie to her to the bed.

**[*P24]** "Finally, the police recovered a black and white striped sheet and a blue blanket from that bed in the back room of Powell's store. The sheet contained one blood stain and the blanket had two blood stains. These blood stains were consistent with Shannon's DNA.

**[*P25]** "2. The corroboration of Shannon's claim that Powell pored [sic] gasoline on her.

**[\*P26]** "Shannon testified that Powell poured gasoline over her and that the gasoline drenched her coat and ran into her mouth and eyes. This testimony was corroborated by the following:

**[\*P27]** "There is absolutely no question that Shannon was drenched with gasoline. Quincy Trammell testified that when he and Gloria Trammel found Shannon on Saturday, Shannon 'had a gasoline smell'; and that her overcoat had a strong odor of gasoline and had several spots of wet gasoline. Likewise, Nurse Black testified that Shannon's 'clothes smelled very strongly of gasoline . . . We had to take some of the clothing off initially just to get them out of the room to get the smell of gasoline [\*\*8] out of the room.' Likewise, Officer Mallott testified that when he contacted Shannon Trammell at the hospital, 'When I opened the door, the first thing I noticed was an almost overwhelming odor of gasoline in the room. It was really very overpowering.' He testified, 'It was coming from the victim.' Finally Michael Wathen, a forensic scientist, examined the canisters containing Shannon's torn panties and torn black pants. Utilizing a gas chromatograph, Wathen determined that both canisters contained gasoline.

**[\*P28]** "Additional testimony confirms that it was in Powell's store that Shannon was drenched with gasoline. Earl Martin testified that when he returned to Powell's store on Friday morning, he mopped up gasoline in the back room where he discovered Shannon handcuffed to the bed and beaten. Also, Gloria Trammel testified that on Saturday, while looking for Shannon in the back room of Powell's store, she detected the odor of gasoline. Finally, Officer Bryant testified that he found in Powell's store a mop with the odor of gasoline.

**[\*P29]** "3. The corroboration of Shannon's claim that Powell handcuffed her to the bed.

**[\*P30]** "Shannon testified that Powell handcuffed her to the bed. This testimony was corroborated by the following:

**[\*P31]** "Earl Martin testified that when he returned Friday morning to Powell's store, Shannon was handcuffed to a bed and 'She was trying to ask me if I would help her.' Her face was 'messed up,' that her eye was black and swollen shut, and her mouth was 'busted.'

**[\*P32]** "Nurse Black testified that Shannon told her that her left wrist had been chained to the bed with a handcuff. Black then

noticed that there was an injury to Shannon's left wrist as shown in State's Exh. 13.36.

**[*P33]** "4. The corroboration of Shannon's claim that Powell anally raped her.

**[*P34]** "Shannon testified that on Friday, February 19, Powell entered the back room of the store, flipped her over on her stomach, bent her upper body over the bed, and penetrated her anally with his penis.

**[*P35]** "Shannon's claims that she was anally raped by Powell was corroborated by Powell's own friend, Earl Martin. On Friday morning, Martin observed Shannon in the back room of Powell's store. She had been beaten, handcuffed to the bed, was naked from the waist up, and was wearing torn pants. Martin testified that on the next day Powell told him, 'My dick got hard and I fucked her in the ass.' Trial Transcript at 1485.

**[*P36]** "B. Powell's suspicious behavior both during and after the incident is indicative of his guilt.

**[*P37]** "On Saturday morning, when Gloria and Quincy Trammell went to Powell's store, Shannon testified that she heard her mother's voice and called out her name, 'Gloria.' Quincy heard someone cry out from the back of the store and recognized the voice as Shannon's. Both Quincy and Mrs. Trammell noticed that Powell became 'nervous' and 'fidgety' and spoke louder to drown out Shannon's cries.

**[*P38]** "After Shannon had been found and reported that she had been kidnaped, assaulted and raped by Powell, the police searched for Powell. Officer Strehle testified that upon arriving at Powell's store, he observed a black male (Powell) jump from a second story window and run down an alley. Powell was pursued by the police. Officer Beal encountered Powell 1/4 mile from his store. When Beal opened his cruiser door, Powell 'took off running.' Powell slipped on gravel and was apprehended. Powell then blurted, 'It's over for me. I wish you would just shoot me.'

**[*P39]** "C. Shannon's behavior and excited utterances immediately after the incident supported her claims against Powell.

**[*P40]** "The behavior and excited utterances of Shannon immediately after the alleged incident support her claims against Powell. Gloria and Quincy Trammell discovered Shannon at the

payphone booth and placed her into the back seat of their car. Quincy testified that Shannon was 'shaking and crying.' When Shannon got onto the floorboard, Gloria asked her why she had done that. Shannon screamed, 'Sergio [Powell] is going to kill me. He's going to kill me.' Quincy recalled that Shannon was 'shaking and crying' and that while crying said that 'Cedric told her if she got away he would blow up her grandmother's house and would kill whomever.'

[*P41] "D. Conclusion

[*P42] "Powell claims that his trial counsel discouraged a witness, Devonte Kelley, from appearing at trial. This, Powell asserts, entitled him to post-conviction relief by reason of ineffective assistance of counsel. In order to prevail on his claim of incompetence of counsel, Powell must establish not only (1) that his trial counsel's effort fell below an objective standard of reasonableness, but also (2) that there [**12] is a reasonable probability that the outcome of his trial would have been different but for the error of his counsel.

[*P43] "Assuming, arguendo, that Powell has fulfilled his burden with regard to the first issue, he fails with regard to the second issue. In considering Powell's Petition, the attached exhibits and supporting affidavits, all the files and records, the trial transcript, and the exhibits admitted into evidence at trial - and construing the evidence in the light most favorable to Powell - this Court finds that there is no reasonable probability that Powell would not have been convicted had Devonte Kelley testified at trial. This Court finds that there are no substantive grounds for relief that would warrant a hearing on Powell's Petition for Post-Conviction Relief.

[*P44] "Therefore, Powell's Petition is hereby DENIED. The State's Motion for Summary Judgment is SUSTAINED."

*Id.*

These findings by Judge Langer establish that even if Mr. Smiley performed deficiently by not calling Deonte Kelley, Powell-El suffered no prejudice thereby as the other evidence against him was quite overwhelming.

Examining 2002 Ground Four de novo, the Magistrate Judge finds the decision of the Second District rejecting this claim of ineffective assistance of trial counsel is not an objectively

unreasonable application of *Strickland, supra.*

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

February 7, 2018.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).